IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**AMERICAN METALS & COAL**
**INTERNATIONAL, INC.**, a Delaware Corporation,

  Plaintiff,

v.

**WHITE MOUNTAIN MINING CO., LLC**
a West Virginia Limited Liability Company,
**APACHE MINING CO, LLC**
a West Virginia Limited Liability Company,

  Defendants,            Civil Action No. 2:05-0822

**WHITE MOUNTAIN MINING CO., LLC**
a West Virginia Limited Liability Company,

  Counterclaimant and Third
  Party Plaintiff,

v.

**AMERICAN METALS & COAL**
**INTERNATIONAL, INC.**, a corporation;
**AMERICAN METALLURGICAL COAL**
**SALES, L.L.C.**, a limited liability company;
and **SCM, INC.**, a corporation

  Counterclaim and Third Party Defendants,

**SCM, INC.**, a corporation,

  Counterclaimant and Third Party Plaintiff,

v.

**WHITE MOUNTAIN MINING CO., LLC**
a West Virginia Limited Liability Company,
**APACHE MINING CO., LLC**
a West Virginia Limited Liability Company,

  Counterclaim and Third Party Defendants.

**REPLY OF AMERICAN METALS & COALS INTERNATIONAL, INC.; AMERICAN METALLURGICAL COAL SALES, LLC; AND SCM, INC. TO "WHITE MOUNTAIN MINING CO., LLC'S RESPONSE TO MEMORANDUM IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT OF AMERICAN METALS & COAL INTERNATIONAL, INC. ET AL."**

American Metals & Coals International, Inc., ("AMCI"); American Metallurgical Coal Sales, LLC ("AMCS"); and SCM, Inc. ("SCM"); by their respective counsel, provide their Reply Memorandum to the Response of White Mountain Mining Co., LLC, ("White Mountain") as follows. For the reasons set forth in detail below, White Mountain has not shown that AMCI, AMCS, and SCM are not entitled to summary judgment on the various claims at issue.

1. **The Court can and should enter judgment on the domestic contract claim at this time.**

Entry of judgment on this claim in an amount certain is appropriate because the doctrine of setoff may not be applied as a defense to this claim and because the existence of a liquidated damages provision does not bar a claim for consequential damages.

   A. **Setoff is not applicable in this instance because the amount claimed as a setoff does not arise from the transaction embodied in the domestic contract.**

For the doctrine of setoff to be applicable as a defense to an action for breach of contract, the setoff must arise from the same transaction as is embodied in the contract breached. Syl. Pt. 3, *Johns-Manville Sales Corp. v. Connelly*, 144 W.Va. 498, 499, 108 S.E.2d 836, 836 (1959) (holding that claim for setoff should have been dismissed by trial court "because it arises out of a different transaction"). It is undisputed that the setoff advanced by White Mountain arises out an alleged breach occurring in 2001,

three years prior to the transaction embodied by the domestic coal sales contract. *See* White Mountain's Memorandum in Response to Joint Motion for Summary Judgment, p. 1, Numbered Paragraphs 1 and 2. Accordingly, setoff is not a defense available to White Mountain in its litigation of its acknowledged breach of the domestic contract, and therefore there is no bar to entry of judgment on the domestic contract breach immediately.

### B. A liquidated damages provision does not bar a concomitant claim for consequential damages.

As set forth in more detail in the Joint Motion for Summary Judgment and its Memorandum in Support, SCM claims both its liquidated damages of $5.44 per ton for each ton not shipped under the domestic contract and its consequential damages in the amount of $135,535.80. Of course, this contract for the sale of goods is governed by the UCC as codified in the *West Virginia Code*. The statute governing liquidated damages, *W. Va. Code* § 46-2-718, does not provide that liquidated damages, where agreed to, provide the exclusive remedy for a breach of contract. The statute allowing consequential and incidental damages, *W. Va. Code* § 46-2-715, does not state in any way that consequential damages are unavailable where the parties have contracted for liquidated damages. Accordingly, as set forth in more detail in the Joint Motion for Summary Judgment, the law applicable to the question establishes the right in SCM to consequential damages, and the mere fact that SCM is also entitled to liquidated damages does not bar summary judgment in SCM's favor in an amount certain now.

White Mountain's citations of authority in no way alter this legal picture. Neither *Stonebraker v. Zinn*, 286 S.E.2d 911 (W.Va. 1982) nor *Charleston Lumber Co. v Friedman*, 61 S.E. 815 (W.Va. 1908), stand for the proposition that a valid liquidated

damages provision bars all other remedies. In fact, both cases focus on the distinction between a valid liquated damages clause and an invalid penalty clause. Further, neither of these cases were decided under the UCC (both involved services contracts). To the extent that non-UCC cases provide relevant authority, it is clear in West Virginia that "[a] provision for liquidated damages will not prevent recovery for actual damages for events which are not covered by the liquidated damages clause, unless the contract expressly provides that damages other than those enumerated shall not be recovered." *Van Kirk v. Green Const. Co.*, 195 W.Va. 714, 719, 466 S.E.2d 782, 787 (1995). In the instant matter, the liquidated damages clause for the domestic contract in no way states that liquidated damages shall be the sole remedy available, nor does it bar consequential damages. Accordingly, the liquidated damages clause in the domestic contract does not, as a matter of law, limit SCM's recovery to the $5.44 per ton figure, and SCM is entitled, as a matter of law, to both the $5.44 per ton not shipped and the $135,535.80 it failed to receive from Wheeling Pittsburgh Steel as a consequence of White Mountain's breach.

2. **Judicial estoppel bars White Mountain's Counterclaims.**

White Mountain argues (A) that there are insufficient undisputed facts to show that it acted intentionally or to gain an unfair advantage when it failed to disclose to its creditors and the bankruptcy court its potential claims against Metcoal and SCM over the course of its bankruptcy, (B) that the AMCI parties are not entitled to claim judicial estoppel by virtue of their alleged "unclean hands," and (C) that its knowledge of its claims was insufficiently detailed for it now to be estopped from presenting the claims. Each of these assertions is incorrect.

### A. White Mountain acted intentionally and received an unfair advantage in its bankruptcy when it failed to list its potential claims against Metcoal/SCM.

The undisputed evidence shows that White Mountain knew of its alleged claims against SCM/Metcoal before and during its bankruptcy and further shows that White Mountain did not identify those alleged claims as an asset. Specifically, Joe Phillips testified that between 1999 and 2001, he became aware of the alleged diversion of White Mountain coal away from Wheeling Pitt to other customers by SCM/Metcoal. Ex. 15 to Joint Motion for Summary Judgment (Depo. of J. Phillips, pp. 104-106). David Hill confirmed Phillips' knowledge and the date of 2001. Ex. 14 to Joint Motion for Summary Judgment (Depo. of D. Hill, pp. 39-40). White Mountain's own bankruptcy lawyer and present counsel in this civil action, John Rollins, was aware of the alleged diversion at least as early as June 19, 2003, during the bankruptcy, when he drafted an email that stated that White Mountain "is considering suing AMCI for Reporting sales to one customer at particular prices while actually redirecting the coal to others at a large mark up that was not passed on in whole or in part to White Mountain." Ex. 13 to Joint Motion for Summary Judgment (Depo. Ex. 32, Email from Rollins to Krieger). Given that White Mountain's own bankruptcy lawyer knew of the existence of these alleged claims and yet failed to identify those claims as assets in the pending bankruptcy, the Court must conclude that White Mountain intentionally failed to raise the claims.

This failure to identify claims did give White Mountain an advantage in its bankruptcy proceedings. Specifically, one of the primary issues in the White Mountain bankruptcy was the overall value of the operation. Phillips had a 50% partner in the White Mountain operation, Congelton LLC, and the proposed plan of reorganization

submitted for the Court's approval placed reorganized White Mountain under Joe Phillips' control and provided for a payment of $5M to Congelton for its equity interest in the original White Mountain. See Exhibit A, attached (Joint Plan of Reorganization, p. 26, section 4.25). Congelton objected to this valuation of its interest, and so objected to the plan. Congelton's objections were ultimately overruled by the Bankruptcy Court, and the Plan was approved. See Order Confirming Amended Plan, doc. # 520, U.S. Bankruptcy Court for SDWV, Bankruptcy Petition #: 5:02-bk-50480.

White Mountain has submitted for the Court's review an expert report which suggests that the value of White Mountain's alleged claims against Metcoal Sales/SCM is in excess of $718,000. See Ex. S to White Mountain's Memorandum in Response, p. 11. This expert report is not, of course, admissible evidence, but assuming it were, it would show that White Mountain failed to list an asset of nearly a million dollars in value in its bankruptcy. By failing to list that asset, White Mountain effectively devalued the equity held by Congelton in White Mountain, and ultimately Phillips and the reorganized White Mountain paid Congelton less than they otherwise would have. Accordingly, White Mountain did in fact receive a significant financial benefit of roughly $359,000 (1/2 of $718,000) by hiding the potential claims against Metcoal/SCM, because White Mountain and Phillips did not have to pay Congelton for the value of the claim as part of its equity interest. Thus, White Mountain did act intentionally and did receive an unfair advantage by virtue of its inconsistent factual positions in the two pieces of litigation.

      **B.**    **Any alleged "unclean hands" on the part of AMCI entities are irrelevant to the question of judicial estoppel.**

Judicial estoppel exists not to protect a party (who may nonetheless receive an incidental benefit from the application of the doctrine), but exists instead to protect the

integrity of the court system. See, e.g., Teledyne Industries, Inc. v. N.L.R.B., 911 F.2d 1214, 1220 (6th Cir. 1990) ("judicial estoppel consistently protects the integrity of the court by estopping a party whenever it has previously persuaded a court to make a decision contrary to the party's current position"); Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 360 (3d Cir. 1996) ("Judicial estoppel is intended to protect the courts rather than the litigants."). Because the doctrine exists for the benefit of the court system, not any particular party, the question of whether or not SCM, AMCS, or AMCI have "clean hands" is irrelevant to the determination of whether the doctrine applies. Accordingly any alleged "unclean hands" on the part of SCM, AMCS, or AMCI (which each party contests) would not and does not bar the application of the judicial estoppel doctrine to White Mountain's claims.

### C. White Mountain had more than sufficient knowledge of its alleged claims prior to and during its bankruptcy to raise them at that point.

As noted in the Memorandum in Support of the Joint Motion for Summary Judgment, Joe Phillips testified that *between 1999 and 2001*,[1] he became aware of the alleged diversion of White Mountain coal away from Wheeling Pitt to other customers by AMCI; David Hill testified similarly about Phillips' knowledge; and John Rollins emailed his knowledge of the potential claims during the pendency of the bankruptcy. Ex. 15 to Joint Motion for Summary Judgment (Depo. of J. Phillips, pp. 104-106); Ex. 14 to Joint Motion for Summary Judgment (Depo. of D. Hill, pp. 39-40); Ex. 13 to Joint Motion for Summary Judgment (Depo. Ex. 32, Email from Rollins to Krieger). An entire process

---

[1] This date makes clear that White Mountain's proffered deposition testimony of Joe Phillips in which he alleges being told by Andrew Fry that SCM/AMCS diverted White Mountain coal for secret profit only after the inception of this litigation is irrelevant. Phillips and his bankruptcy lawyer obviously knew of these alleged claims prior to bankruptcy.

204729                              -7-

exists within the bankruptcy proceedings to determine what value, if any, these alleged claims have—discovery and adversary proceedings. It is disingenuous for White Mountain to claim now that, although it knew that they had a claim of some value, it did not have an adequate understanding of that value to present the claim in its bankruptcy. White Mountain had a duty to disclose all assets of value, regardless of what that value was, and failed to do so. Because ample procedures existed in the bankruptcy arena to determine what value, if any, those alleged claims, had, it is now doubly disingenuous for White Mountain to try to receive payment for them in this litigation.

> **3.  While issues of fact may exist relating to the Export Contract, those issues are not material to AMCI's entitlement to judgment.**

A genuine issue of material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute presents a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* While White Mountain may have identified issues of fact relating to the export contract, those issues are not genuine issues of material fact which preclude judgment in AMCI's favor.

As set forth in detail in the Memorandum in Support of the Joint Motion for Summary Judgment of AMCI, AMCS, and SCM, there is no dispute regarding Andrew Fry's role and apparent authority to enter into contracts upon White Mountain's behalf. Memorandum in Support, pp. 20-24. Key to the issue are both Phillips' and Fry's sworn testimony that Fry's job was to sell White Mountain's coal, and Fry's and Hans Mende's testimony that Fry did in fact contract with AMCI as set forth in the export contract. *Id.*

The sworn testimony from Fry and Mende establishes that no coal was ever shipped under the export contract. *Id*. Therefore, at the very least, there is no material issue of fact regarding the existence of the export contract and its breach. None of the items raised by White Mountain are material to the determination of Fry's apparent authority, the existence of the contract, or its breach, because none of those facts could allow a reasonable jury to find that the contract did not exist or was complied with by White Mountain, given the governing law. Should the Court determine that White Mountain has raised a material issue of fact regarding the proper amount of damages due AMCI under the export contract, the appropriate course of action would be to enter judgment on liability and allow proceedings to go forward to establish the exact amount of damages owed.

For all the foregoing reasons and those set forth in Memorandum in Support of the Joint Motion for Summary Judgment, AMCS, AMCI, and SCM respectfully request that the Court enter judgment in their favor on each of the claims raised in this litigation.

**AMERICAN METALLURGICAL COAL SALES, INC.**

**By Counsel**

*/s/ Christopher S. Morris*
Brian A. Glasser (WVSB #6597)
Christopher S. Morris (WVSB #8004)
Bailey & Glasser, LLP
227 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110 *facsimile*

**AMERICAN METALLURGICAL COAL SALES, L.L.C., a limited liability company and SCM, INC.**

**By Counsel**

/s/ Mark E. Troy
Charles R. Bailey (WVSB #202)
Mark E. Troy (WVSB # 6678)
Bailey & Wyant, PLLC
P.O. Box 3710
Charleston, WV 25337-3710
(304) 345-4222

204729

-10-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**AMERICAN METALS & COAL**
**INTERNATIONAL, INC., a Delaware Corporation,**

       **Plaintiff,**

**v.**

**WHITE MOUNTAIN MINING CO., LLC**
**a West Virginia Limited Liability Company,**
**APACHE MINING CO, LLC**
**a West Virginia Limited Liability Company,**

       **Defendants,**                                 Civil Action No. 2:05-0822

**WHITE MOUNTAIN MINING CO., LLC**
**a West Virginia Limited Liability Company,**

       **Counterclaimant and Third**
       **Party Plaintiff,**

**v.**

**AMERICAN METALS & COAL**
**INTERNATIONAL, INC., a corporation;**
**AMERICAN METALLURGICAL COAL**
**SALES, L.L.C., a limited liability company;**
**and SCM, INC., a corporation**

       **Counterclaim and Third Party Defendants,**

**SCM, INC., a corporation,**

       **Counterclaimant and Third Party Plaintiff,**

**v.**

**WHITE MOUNTAIN MINING CO., LLC**
**a West Virginia Limited Liability Company,**
**APACHE MINING CO., LLC**
**a West Virginia Limited Liability Company,**

       **Counterclaim and Third Party Defendants.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies the foregoing **REPLY OF AMERICAN METALS & COALS INTERNATIONAL, INC.; AMERICAN METALLURGICAL COAL SALES, LLC; AND SCM, INC. TO "WHITE MOUNTAIN MINING CO., LLC'S RESPONSE TO MEMORANDUM IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT OF AMERICAN METALS & COAL INTERNATIONAL, INC. ET AL."** was served upon counsel of record as set forth below, via electronic filing this 5th day of July, 2007.

John A. Rollins, Esq.
Spencer D. Elliott, Esq.
Lewis, Glasser, Casey & Rollins
P.O. Box 1746
Charleston, WV  25326-1746


*/s/ Christopher S. Morris*
Christopher S. Morris (WVSB #8004)

IN THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

In re:

WHITE MOUNTAIN MINING
COMPANY, LLC, a limited
liability company, et. al.

Debtors

Case No. 02-50480
Chapter 11
Procedural Consolidation

JOINT PLAN OF REORGANIZATION
AS AMENDED APRIL 7, 2004

The Debtors, White Mountain Mining Company, LLC, Cimmeron Resources, LLC, Left Fork Processing, LLC, Apache Mining, LLC, Mohawk Resources, LLC, Maverick Mining, LLC, and New South Resources Co., doing business as Black Hawk Mining, hereby jointly propose the following Plan of Reorganization, as amended, pursuant to the provisions of Chapter 11 of Title 11, United States Code.

ARTICLE I

Definitions

For the purposes of this Plan of Reorganization, the following terms shall have the meanings set forth below. Unless otherwise indicated, the singular of any definition shall include the plural. Certain terms such as Claim or Case may not be capitalized in the Plan, but such usage shall nevertheless be deemed to be use of the term as defined and provided for in Article I of the Plan.

1.01. *Allowed Claim* shall mean: (a) a Claim, for which either (i) no proof of claim or application for allowance of a claim is filed, but has been listed by the Debtor in the Schedules in an amount that is not indicated as disputed, contingent or unliquidated, or (ii) the amount in a proof of claim or application for allowance of a timely claim filed with the Court, where no



WM 000000301

the total payments defined under this class shall be reduced by the amount of such Interest. The amount of the Interest so deducted shall be added as an Interest to be paid pro rata with the $5,000,000.00 Interest of Congelton in Class Seventeen, as provided in such class.

4.22    <u>Class Fourteen - Mechanic's Lien Claims</u>. The Allowed Claims in this class, plus interest thereon at the Plan Rate, shall be paid in full by consecutive monthly payments of $15,084.92, commencing on the Consummation Date and continuing each and every month thereafter until all such Claims are paid in full.

4.23    <u>Class Fifteen - Inter-company Claims</u>. The Claims in this class shall receive no payment under the Plan.

4.24    <u>Class Sixteen - Penalty Claims</u>. The Allowed Claims in this class shall be paid in full by payments of the Reorganized Debtors of $10,000.00 per month commencing on the month following the payment in full of the Allowed Claims in Class Twelve or the maximum Class Twelve contributions made, and continuing each and every month thereafter until all such Claims shall have been paid in full. The obligation of the Reorganized Debtors to fund the Claims in this class shall be limited to cumulative total payments not to exceed $120,000.00.

4.25    <u>Class Seventeen – Equity Interests – White Mountain</u>. The Reorganized Debtors shall pay Congelton the sum of $5,000,000.00, plus simple interest thereon until paid at the rate of two percent per annum, in satisfaction of its Interest in White Mountain. The payment shall occur monthly in an amount equal to the greater of (i) $100,000.00 per month, or (ii) an amount equal to the total distribution amount set forth in Section 4.20 of the Plan governing payment of Class Twelve Unsecured Claims. Such payments shall commence on the first month after both the Unsecured Claims in Class Twelve and the Phillips Claim in Class Thirteen shall have been paid in full and shall continue each and every month thereafter until all principal and interest has

WM 000000326

been paid in full. In the event of a sale or transfer of all or substantially all of the assets of the Reorganized Debtors, or of a sale or other transfer of a cumulative total of more than fifty (50) percent of the New Equity Units after the Confirmation Date, all payments due for the Congelton Interest under the Plan shall become due and payable within thirty (30) days following consummation of such sale. All such payments shall have a priority in payment over any payment or distribution right of the holders of the New Equity Units of the Reorganized White Mountain, except as otherwise provided in Section 7.04 of the Plan. In the event of any sale or other transfer described in this paragraph that occurs within twelve (12) months after the Consummation Date, there shall be an additional payment due to Congelton of $1,000,000.00. In the event the Phillips Claim in Class Thirteen is determined to be in whole or part an Interest such that the Interest is deemed to be included in this class, then treatment of Interests in this class shall be deemed amended such that the total payments in this class in the monthly amounts noted shall continue until an amount equal to the total of (i) $5,000,000.00, (ii) the total of the Phillips Allowed Claim in Class Thirteen that is deemed an Interest included in this class, and (iii) interest on each such Interest at two percent per annum, is paid in full. The monthly payments provided shall be made *pro-rata* to Phillips and Congelton based on the amount of their respective Interests included in the class.

    4.26 <u>Class Eighteen - Equity/Management Interests - White Mountain</u>. Mowbray/Phillips shall receive no payment on account of the equity and management Interests in White Mountain. On the Effective Date, Mowbray and/or Phillips shall be issued all of the New Equity Units in the Reorganized White Mountain and Phillips shall be the manager of the same under the terms of the Operating Agreement for the Reorganized White Mountain, all as set forth in Article VII of the Plan. The Reorganized White Mountain shall make no distributions to

WM 000000327