IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AMERICAN METALS & COAL
INTERNATIONAL, INC.,
a Delaware Corporation,

       Plaintiff,

v.

WHITE MOUNTAIN MINING CO., LLC
a West Virginia Limited Liability Company,
*et. al.*

       Defendants,                    Civil Action No. 2:05-0822


WHITE MOUNTAIN MINING CO., LLC
a West Virginia Limited Liability Company,

       Counterclaimant and Third
        Party Plaintiff,

v.

AMERICAN METALS & COAL
INTERNATIONAL, INC. SCM, INC.,

       Third Party Defendants and
       Counterclaimants.

REPLY MEMORANDUM IN SUPPORT OF WHITE MOUNTAIN'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

    AMCI's Response Brief ('Response") concedes the only material fact at issue –
that the Export Order was tied to the release of the pre-petition secured lien on White
Mountain's coal preparation plant.  Because of this single undisputed fact, the Court is
only faced with a single question of law – Did the Export Order require bankruptcy
approval to be binding on White Mountain?

    White Mountain agrees that evidence shows Andy Fry purported to make an
export coal sales agreement with Hans Mende.  White Mountain claims it never knew of

this deal at the time it was apparently negotiated.  In addition, the evidence is conflicting as to the form of the contract, that is pricing, quantity, purchaser, delivery point, starting date, and the extent to which the terms were later renegotiated by Andy Fry and Mr. Mende.  However, that conflicting evidence is immaterial if bankruptcy approval was required for such an agreement, *in any form*, to be binding on White Mountain. As will be established below, the undisputed fact that the Export Order was tied to the lien release has determinative implications.  That single undisputed fact alone establishes (i) that the Export Contract could not have been an "ordinary course of business" transaction as a matter of law, and (ii) bankruptcy approval was required *both* under 11 U.S.C. §363(b)(1) and Bankruptcy Rule 9019.

*The Undisputed Material Fact*

Hans Mende testified that the Domestic Order and the Export Order were two facets of a single transaction designed to satisfy the SCM secured claim and release the lien against White Mountain's prep plant.  Exhibit H.   AMCI and SCM's joint attorney corresponded with Andy Fry that the Export Order was related to the lien release. Exhibit O. At this point it is undisputed that AMCI intended White Mountain to fill the Export Order as additional consideration for satisfaction of the secured claim and release of the prep plant lien.[1]   AMCI actually confirms this factual agreement in its Summary Judgment Response.  AMCI Response at p. 14.

---

[1]  Although not material to summary judgment, it is also undisputed that no one told White Mountain about the Export Order when it was apparently being negotiated.  All correspondence in the record shows the Export Order communications were isolated to AMCI personnel, AMCI's attorney and Andy Fry.  That explains two peculiar facts that AMCI makes not even the slightest effort to explain.  First, there is no actual signature on any document supporting the existence of an Export Order in the same fashion as exists for the Domestic Order that was apparently negotiated contemporaneously with the Export Order.   Second, White Mountain's Amended Plan referenced only the Domestic Order as the method satisfaction of the prep plant claim and lien release and the attorney for both AMCI and SCM signed the ballot voting in favor of the Plan.

2

In an effort to avoid summary judgment, AMCI attempts to convince the Court that this was a simple "agent makes an ordinary day-to-day coal sales transaction." However, closer review shows that AMCI's own response defeats its ordinary course of business argument. In one breath, AMCI attempts to characterize the Export Order as purely an ordinary course of business transaction because White Mountain (and its subsidiary Apache) were in the business of selling coal, only to later acknowledge that the Export Order involved more than the pure purchase and sale of coal because it was *tied to the lien release*. As demonstrated below, that admission, coupled with Mr. Mende's undisputed testimony and Mr. Barbery's correspondence, demonstrates that the Export Order was an effort to compromise a pre-petition secured debt with post-petition property, and that is not an ordinary course of business transaction as a matter of law. As such, it was required to be noticed for hearing under the provisions of 11 U.S.C. §363. Because this was not done, any dispute over the pricing, tonnage, term, purchaser, delivery point, renegotiation of pricing, mitigation of damages, or any other disputed aspect of the Export Order is immaterial. One fact drives this decision – AMCI tied the Export Order to satisfaction of a pre-petition bankruptcy debt and Congress has forbidden anyone to try to sneak such a deal behind the backs of creditors and the Court. Because approval was not sought and obtained under 11 U.S.C. §363, the Export Order may not be enforced against White Mountain.

Although Section 363 of the Bankruptcy Code is more than ample authority for the grant of summary judgment in White Mountain's favor, the Export Order was, in fact, a *compromise* of a creditor claim and a lien on estate property and, under the *majority*

*rule*, such a compromise must be noticed to creditors and approved by the bankruptcy court as contemplated under Bankruptcy Rule 9019.

### The Export Order Was Not An Ordinary Course of Business Transaction

AMCI and White Mountain actually agree that 11 U.S.C. §363 plays a role in the Court's determination.  However, AMCI conveniently ignores the lien release facet of the Export Order when it asserts that this was just a coal sales transaction in the ordinary course of business.  Specifically, on pages 6 through 8 of the response, AMCI argues that the Export Order merely involves the sale of coal and such an activity is the normal day to day business of White Mountain.  However, on page 14 of the Response, AMCI delivers the fatal blow to its own argument:

> White Mountain is essentially arguing that, as a debtor in possession, it could enter into a contract via its acknowledged agent with AMCI (a nonparty to the bankruptcy action), *accept the benefit of the release of a lien which was tied to that contract*, and later disavow the contract by virtue of its own failure to apprise the bankruptcy court of the existence of the agreement.

*Id.* at p. 14 (emphasis supplied).  Although the foregoing quote may well be significant for any number of reasons,[2] it solidifies the inescapable conclusion that the Export Order was absolutely *not* an ordinary course of business transaction.

The fact of the matter is, outside of a bankruptcy (and ignoring the lien release issue), Andy Fry's unilateral actions could have bound White Mountain to ship export coal to AMCI.  However, AMCI fails to recognize the transparency that a bankruptcy requires and the Court's monitoring of claim resolution and estate property are not *mere*

---

[2] Particularly fascinating is that (1) AMCI knows White Mountain was unaware of the Export Contract, (2) White Mountain made no reference to it in the Plan, a Plan that *did* discuss the Domestic Order as the *sole* method of satisfying the secured prep plant lien, (3) AMCI's attorney signed the SCM ballot voting in favor of the Plan, and AMCI now has the audacity to fault White Mountain for failing to bring the Export Order to the Court's attention!

*recommendations*.   The creditor body as a whole is entitled to know if and how a bankruptcy debtor in possession is satisfying a secured claim and releasing a lien against estate property.  AMCI did not walk through the front door with the Export Order in the same fashion it did with the Domestic Order.  AMCI is trying to sneak the Export Order in through the back door.  The Export Order was a secret deal that impacted estate property and a secured claim without the debtor, the creditors or the Court being advised.  Secrets are not permitted in bankruptcy.  In fact, as set forth more fully below, the reason Rule 9019 is viewed, *under the majority rule*, as mandatory, is precisely to prevent the type of back door secret deal that AMCI is trying to sneak past everyone now.

The Export Contract was unquestionably a transaction involving estate property outside of the ordinary course of business and AMCI cannot overcome the absolute statutory mandate of 11 U.S.C. §363 that use of estate property outside of the ordinary course of business requires notice to creditors and approval by the Bankruptcy Court.

*The Export Order Is Invalid Without Court Order Because*
*11 U.S.C. §363 Requires Notice and a Hearing For Use Of*
*Post-Petition Property In Satisfaction Of A Prepetition Claim*

AMCI is correct that Section 363 permits a debtor to use, lease or sell its property in the ordinary course of business without notice and a hearing.  Of course, the counterpart to that is that Section 363 absolutely requires notice and a hearing if estate property is going to be used *outside* of the ordinary course of business.[3]   Had the Export Order been simply a coal-for-money transaction, that might be considered ordinary course.  However, as asserted by AMCI, the Export Order called for White Mountain coal (estate property) to be sold to satisfy a pre-petition secured claim (which requires

---

[3] 11 U.S.C. §363(b)(1) states "The Trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the state."

court approval for payment) and to release a pre-petition lien against property of the estate (outside of ordinary course).

Simply stated, AMCI intended the Export Order as a post-petition transfer of estate property in consideration for, and satisfaction of, a pre-petition secured claim. Case law consistently holds this is not an ordinary course transaction:

> In this instance respondent argues that the transfers at issue were made in the ordinary course of business and were "value for value transfers" within the purview of the debtor-in-possession status. However, the $2,356.90 was paid to respondent from debtor's funds in order to satisfy an indebtedness that was incurred long before the filing of debtor's bankruptcy petition. These payments cannot be considered transfers "in the ordinary course of business."

*In re White Beauty View, Inc.*, 70 B.R. 90, 93 (Bankr. D. Pa. 1987).

> The phrase "ordinary course of business", as used in 11 U.S.C. 363(c), and 364(a), is not defined by the Bankruptcy Code. It cannot, however, in my judgment, in the context of either section, be construed to permit of payments (uses of property of the estate) which are unequivocally inimical to the theory and philosophy of the Bankruptcy Code. That Code does not permit of the payment, post-bankruptcy, out of the property of the estate, of pre-petition debts.

*In re J.T.L., Inc.*, 36 B.R. 860, 861-862 (Bankr. D. Mo. 1984). *See also Clark v. First State Bank (In re White Beauty View, Inc.)*, 70 B.R. 90, 92-93 (Bktcy. M.D. Pa. 1987) (post-petition bankruptcy transfers made in order to satisfy pre-petition debts are out of the ordinary course of business and subject to being avoided).

White Mountain followed the rules. White Mountain was led to believe the Domestic Order was the only source of satisfaction of the secured claim against the prep plant.   The Domestic Order was not only a compromise as contemplated under

Bankruptcy Rule 9019, but it was the use of bankruptcy property outside of the ordinary course of business as contemplated under 11 U.S.C. §363.

AMCI claims that White Mountain should be estopped from its inequitable conduct from receiving a benefit from the Export Order (i.e. lien release) without being bound to supply coal under the Export Order.  Ironically, it is AMCI that should be estopped.  AMCI made a secret, back door deal for a lien release without obtaining any documentation to support it.  When the coal market spiked, AMCI looked to capitalize on the undocumented Export Order that never materialized into a written contract. However, AMCI's attorney signed the ballot that voted in favor of White Mountain's Plan, the Plan which listed the Domestic Order as the sole method of satisfaction of the secured claim on the prep plant.  It is AMCI that should be estopped from trying to cash in on its own failure to play by the rules of contract law *and* bankruptcy law - The same rules it obviously knew how obey in making and approving the Domestic Order.

In any event, it is undisputed that AMCI intended that White Mountain use post-petition property (coal) to fill the Export Order as consideration for satisfaction and release of a pre-petition secured claim against bankruptcy estate property.  The case law is clear – such a transaction is not an ordinary course of business use, sale or lease of estate property and it must be noticed for hearing and approved by the bankruptcy court. Because creditors were never given an opportunity to review or object to such a use of estate property in satisfaction of a prepetition secured claim, it is void and White Mountain is entitled to summary judgment on the Export Order as a matter of law.

*The Export Order Is Also A Compromise of a Secured Claim Which, Under the Majority View of Bankruptcy Rule 9019, Makes Notice And Court Approval Mandatory.*

The Court may grant summary judgment under the authority of 11 U.S.C. §363 alone.  However, White Mountain feels compelled to refute AMCI's attempts to discredit cases that deem notice and approval of compromises as a mandatory process under Bankruptcy Rule 9019.  AMCI's Response would have this Court believe that White Mountain's authority regarding the mandatory nature of Bankruptcy Rule 9019 is renegade, unreliable and suspect – it is not – *it is the majority view*. 78 Or. L. Rev. 425, 437.

AMCI is correct that there are a few opinions that view Bankruptcy Rule 9019 as procedural rather than substantive. However, none of these cases are discussing the compromise as being a compromise of a pre-petition *secured* claim. As was stated in a 1999 law review article entitled "The Sanctity of Settlements and the Significance of Court Approval: Discerning Clarity from Bankruptcy Rule 9019," the author noted:

> As mentioned above, [footnote omitted] unlike its predecessor Rule 919 under the Bankruptcy Act, Rule 9019 neither has, nor is it based upon, a corresponding substantive section of the Bankruptcy Code. [footnote omitted]  Accordingly, some courts read Bankruptcy Rule 9019 as solely procedural, providing no substantive rights to notice and hearing. In *In re Dow Corning Corp.*, [footnote omitted]  the court held "Rule 9019, being merely a rule, can do no more than establish a procedural mechanism for exercising a statutory power." [footnote omitted]   Extending this line of reasoning to its logical conclusion, some courts have further held that since Bankruptcy Rule 9019 is procedural only, substantive rights to notice and hearing must come from a substantive section of the Bankruptcy Code. Accordingly, in *In re Telesphere Communications, Inc.*, [footnote omitted]   the court declared that Bankruptcy Rule 9019(a) "provides a procedure for motions to settle, but it cannot create a substantive requirement for court approval that does not exist in the Code itself."

78 Or. L. Rev. 425, 435-436.  Interestingly, the quote in the final sentence comes from the *Teleshpere* opinion relied upon by AMCI.  What is even more interesting though, is that 11 U.S.C. §363(b)(1) discussed above provides the "substantive requirement" for notice and a hearing to compromise a pre-petition secured claim to the extent Bankruptcy Rule 9019 by itself does not mandate notice and a hearing for a garden variety compromise.  Thus, even under the standard advocated by AMCI, the Court, in examining the compromise provisions of Bankruptcy Rule 9019, need only look to 11 U.S.C. 363 for Congressional substantive mandate for notice and a hearing.

As to the mandatory nature of Rule 9019 by itself, the law review article states: "A split of authority exists as to whether Bankruptcy Rule 9019's provisions relating to bankruptcy court approval are mandatory or permissive. *The great weight of authority holds that these requirements are mandatory.*" 78 Or. L. Rev. 425, 437 (emphasis supplied).  See also *In re Signet Industries, Inc.*, 1998 U.S. App. LEXIS 22652 (6th Cir. 1998) (oral compromise involving agreement to dispose of debtor-in-possession assets unenforceable for failure to obtain court approval per Bankruptcy Rule 9019); *Reynolds v. Commissioner*, 861 F.2d 469, 473 (6th Cir. 1988) (In bankruptcy proceedings, as distinguished from ordinary civil cases, any compromise between the debtor and his creditors must be approved by the court as fair and equitable); *In re Blehm Land & Cattle Co.*, 71 B.R. 818, 823 (D. Colo. 1987) (rev'd on other grounds) (trustee does not have discretionary authority to settle a controversy without moving the court for approval, providing notice to interested parties, attending a hearing, and obtaining formal court approval); *Zerodec Mega Corp. v. Terstep of Texas, Inc.* (In re Zerodec Mega Corp.), 47 Bankr. 304, 308-09 (Bankr. E.D. Pa.), *modified*, 60 Bankr. 884 (E.D. Pa. 1985)

(compromise invalid because creditors were not given notice as required under Bankruptcy Rule 9019); *In re Git-N-Go, Inc.*, 322 B.R. 164, 175 (Bankr. D. Okla. 2004) (compromise of creditor's rejection claim was unenforceable because no notice or opportunity for hearing was provided under Rule 9019); *In re Thompson*, 116 B.R. 679 (Bankr. W.D.Ark. 1990)(Compromise agreement regarding disputed fee was not a valid compromise because creditors were not given notice as required under Bankruptcy Rule 9019).

Perhaps the most pertinent consideration in Rule 9019 analysis is the stated philosophy, or purpose, for making 9019's notice requirements mandatory:

> Many courts have noted that the purpose behind Bankruptcy Rule 9019 is to prevent secret agreements between the debtor and other parties, and to provide interested creditors with a right to object to the proposed settlement. In *Columbia Gulf Transmission Co. v. Louisiana Natural Gas Pipeline, Inc.*, [1994 WL 693361 (E.D. La. 1994)] the court declared, "this rule prevents debtors from entering into secret agreements and safeguards the rights of creditors who otherwise might be harmed by providing them with an opportunity to object to the proposed settlement if they find it unsatisfactory." [footnote omitted] In *In re Masters, Inc.*, [141 B.R. 13 (Bankr. E.D.N.Y.), aff'd, 149 B.R. 289 (1992)] the court declared even more precisely that the "clear purpose of Rule 9019 is to prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court."

78 Or. L. Rev. 425, 434-435.  It is not surprising that AMCI is attempting to ignore the majority standard and its underlying philosophy.  AMCI is trying to enforce a concealed agreement not put before creditors and the bankruptcy court.

In addition, AMCI further attempts to divert the Court by distinguishing the *Tidewater* case as a pre-code case and thus, irrelevant to the discussion of Rule 9019. *In re Tidewater Group*, *Inc.*, 8 B.R. 930 (Bankr. N.D.Ga. 1981). The fact that *Tidewater* is a pre-code case does not make its holding any less significant.  In fact, *Tidewater* is not so

much important because of its stance on the mandatory nature of the notice and hearing requirements for compromises under the pre-code Rule 919.   Rather, *Tidewater* is important for the proposition that would hold equally true *after* passage of the Bankruptcy Code, namely that an agent of a debtor-in-possession is bound by the authority of his principal. *Id*. at 932. (footnote 2).   Which, of course, begs the question – If White Mountain could not release the prep plant lien in consideration for the Export Order without notice and a hearing, what authority would permit Andy Fry to do so unilaterally? *See agency discussion below*.

In summary, AMCI's position that no notice or hearing was required under Bankruptcy Rule 9019 is still the minority position.  The majority position, the one that follows the philosophy of full disclosure of secret deals to creditors and the Court, is the one that holds Rule 9019's notice and hearing requirements to be mandatory.  Like the 11 U.S.C. §363 analysis above, the Bankruptcy Rule 9019 analysis is also purely a legal question and there are no material facts in dispute that would prohibit summary judgment if this Court agrees with the majority view.  To the extent the Court rests its decision on the mandatory nature of the substantive notice and hearing requirements set forth by Congress in 11 U.S.C. §363 for use of estate property not in the ordinary course of business, the Court need not base its decision on Bankruptcy Rule 9019 at all.

*To The Extent AMCI Takes The Position the Export Order Is Valid Pending Bankruptcy Approval, Then White Mountain Accepts AMCI's Invitation For the Bankruptcy Court To Make That Determination*

AMCI makes note of the fact that it objects to any effort by White Mountain for reference of these issues to the Bankruptcy Court for determination.  For the record,

White Mountain has not asserted that the bankruptcy issues *need* to be referred to the bankruptcy court but has only advised that such a reference is an option given the Bankruptcy Court's familiarity with the debtor's case and with the bankruptcy questions presented.  However, AMCI devotes a separate section of its Response to arguing that, even if Rule 9019 requires notice and approval, that the Export Contract is binding upon White Mountain until approved.  White Mountain disagrees because the Export Order, as indicated above, was an attempt to create a contract to use post-petition estate property to satisfy a pre-petition secured claim.  As was indicated above, such a transaction requires Court approval.  However, if it is performed without Bankruptcy Court approval, it may be avoided under the provisions of 11 U.S.C. §549 as an unauthorized post-petition transfer, and this avoidance may be done at the sole discretion of the trustee/debtor-in-possession. *Rathbone v. Lake* (*In re Consol. Partners Inv. Co.*), 156 B.R. 982, 984-85 (Bankr. N.D. Ohio 1993)(holding unauthorized post-petition transfers voidable at trustee's discretion).  Thus, the "valid until approved" argument seems a bit nonsensical.

Regardless, AMCI's position certainly sounds like a request for the Bankruptcy Court to rule on the *pending* question of whether White Mountain is obligated to perform the Export Contract.  White Mountain believes this Court can dispense with summary judgment on the Export Order without need to refer any bankruptcy-related matters to the Bankruptcy Court.  However, if AMCI is going to take the position that White Mountain is bound under the Export Order *pending approval by the Bankruptcy Court*, White Mountain will gladly address the issues of a secret lien release coal sales deal behind the backs of the debtor-in-possession, creditors *and* the Court, before the Bankruptcy Court.

*Although Apparent Authority Issues Are Immaterial To A Grant of Summary Judgment on the Export Order, AMCI's Blind Reliance on Andy Fry's Ability to Unilaterally Release a Lien Against Estate Property Was Unjustified As A Matter o Law.*

AMCI makes the incredulous argument that Andy Fry had *actual* authority to bind White Mountain to the Export Order because Andy Fry, through Winding Gulf, was White Mountain's acknowledged coal sales agent.  Or if he did not, AMCI asserts he had the apparent authority.  However, any discussion of agency principles, be they actual or apparent, must involve one question – as White Mountain's coal sales agent, what did Andy Fry have the authority, actual or implied, to do?  This brings us full circle to the ordinary course of business discussion.   AMCI has expressly acknowledged in correspondence, in sworn testimony, and in its Summary Judgment Response, that the Export Order was tied to release of the prep plant lien.

Whatever authority Andy Fry did possess, White Mountain is confident that he did not possess the unilateral authority, actual or apparent, to sell post-petition coal to release a pre-petition lien against estate property. *See discussion above.* This is precisely the reason the parties executed documents evidencing the Domestic Order and that transaction was noticed to creditors and submitted for approval under White Mountain's Plan.

Again, this really goes to the heart of the 11 U.S.C. §363 issues but White Mountain thought it worth mentioning in its original Motion for Partial Summary Judgment to demonstrate that it was unreasonable for AMCI to blindly rely on Andy Fry having apparent authority as an additional factor to consider in addressing summary judgment.

In yet another diversionary argument, AMCI takes White Mountain to task not on the merits of what happens when a third party has reason to question an agent's authority, but on the issue of whether White Mountain properly attributed the authority to the Restatement. Although irrelevant to the merits, White Mountain will simply point out that the *Clint Hurt* opinion cites *Am Jur*'s position on apparent agency which, not surprisingly, cites the Restatement of Agency as follows:

> In addition to actual authority, an agent can bind a principal based on apparent authority, which the principal has knowingly permitted an agent to assume. Apparent or ostensible authority results from "statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority. (Footnotes omitted.)" 3 Am. Jur. 2d, Agency § 79 (1986), citing, Restatement, Agency 2d § 27.

*Clint Hurt & Assocs. v. Rare Earth Energy*, 198 W. Va. 320, 327 (W. Va. 1996). The actual quote is, as AMCI points out, is taken from Am Jur. AMCI hopes that pointing out the "Am Jur. versus Restatement as the source" issue will divert the Court from the indisputable fact that **it is *West Virginia's* position** that "The general rule is that one dealing with an agent is bound at his peril to know the agent's authority." *Clint Hurt & Assocs. v. Rare Earth Energy*, 198 W. Va. 320, 328 (W. Va. 1996).

AMCI is painstakingly aware that Hans Mende knew of White Mountain's bankruptcy and went so far as to inquire about Andy Fry's limitations:

> (f) what shipping schedule can you give us on the extra 60,000 tons for AMCI?
> (g) ideally we would prefer a lien release prorate as the coal is shipped . . . is this possible Andy.
> (**h**) **do we need bankruptcy approval on the transaction?**

Exhibit J, JDE 65 (emphasis supplied). AMCI could have taken any number of steps to inquire of Andy's authority to release a lien, or to document the Export Order with signed

contractual documents.  AMCI was clearly on notice that Andy Fry's authority had limitations given White Mountain's bankruptcy.

Moreover, AMCI's diversion does not change the fact that the West Virginia Court cites, albeit in a footnote, to the applicable language that is damaging to AMCI:

> According to 3 Am. Jur. 2d, Agency § 80 (1986), the following prerequisites are needed to establish that an agent has apparent authority to do the act in question:
>
>> "(1) That the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal."

*Clint Hurt & Assocs. v. Rare Earth Energy*, 198 W. Va. 320, 327 (W. Va. 1996).  As set forth more fully in White Mountain's initial brief, AMCI cannot satisfy West Virginia's standard regardless of whether the original source comes from Am Jur. or the Restatement.   The undisputed facts demonstrate that Hans Mende could not, *in good faith*, believe Andy Fry had the unilateral ability to release a lien against White Mountain's prep plant without bankruptcy court involvement.   If that is not an independent ground for summary judgment, it nevertheless reinforces a determination that the Export Order was outside of the ordinary course of business, even for Andy Fry's authority, and constitutes a transaction that required notice and a hearing under applicable bankruptcy law.

*Several Immaterial Housekeeping Matters*

AMCI makes an irrelevant side trip to point out two apparently disputed facts –
neither of which appears to be truly disputed or material to summary judgment on the
Export Order.  First, AMCI quotes White Mountain's brief for the proposition that
"AMCI and/or its subsidiary SCM held a secured lien . . . ."  Response at p. 2.  In a
defiant effort the highlight a disputed fact, AMCI . . . *agrees* with the statement by stating
that SCM, not AMCI held the lien on the prep plant (which is of course entirely
consistent with the "and/or" statement in White Mountain's brief).

Second, AMCI accuses White Mountain of representing that "[t]here exists no
signed sales acknowledgement regarding the alleged Export Order in the documentary
record."  In the next sentence, AMCI states that to the extent the representation means no
one signed the document, (as is often done with potentially multimillion dollar coal sales
transactions), "this representation is correct."  *Id*. at p. 2.

As it turns out, AMCI's two disputed facts are not really in dispute.  More
importantly, even if they were really disputed, they are immaterial to summary judgment.
Any dispute over which AMCI entity actually held the lien on the prep plant is
immaterial to summary judgment because AMCI concedes that the Export Order was tied
release of the lien.  At that point, the identity of the AMCI company that specifically held
the lien is immaterial.

The signature issue is a red herring because it is undisputed that the Export Order
was tied to satisfaction of a prepetition secured claim and hence, outside the ordinary
course of business.  Even if the Export Order had been executed, it would not be binding

without notice to creditors and bankruptcy court approval under 11 U.S.C. §363 and/or Bankruptcy Rule 9019.

Thus, the only two facts AMCI alleges to be in dispute in its Response are both undisputed and immaterial to analysis of 11 U.S.C. §363 and Bankruptcy Rule 9019. Because AMCI concedes that the Export Order was intended as post-petition use of bankruptcy property to satisfy a prepetition secured claim, the Export Order was, as a matter of law, a transaction outside of the ordinary course of business. Given that this compromise was not noticed to creditors nor approved by the bankruptcy court in violation of both 11 U.S.C. §363 and Bankruptcy Rule 9019, the Export Order is unenforceable against White Mountain as a matter of law.

WHITE MOUNTAIN MINIG CO., LLC<br>
By Counsel

LEWIS, GLASSER, CASEY<br>
 & ROLLINS, PLLC

/s/ Spencer D. Elliott<br>
/s/ John A. Rollins<br>
John A. Rollins, WV Bar #3165<br>
Spencer D. Elliott, WV Bar #8064<br>
P.O. Box 1746<br>
Charleston, WV 25326<br>
(304) 345-2000

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 5, 2007 he served the foregoing on the persons hereafter set forth by First Class United States Mail, postage pre-paid, to the address noted and/or by electronic service.

Chris Morris
Bailey & Glasser, LLP
227 Capitol Street
Charleston, WV 25301

Mark Troy
Jennifer Edelman
Bailey & Wyant, PLLC
P.O. Box 3710
Charleston, WV 25337-3710

/s/ Spencer D. Elliott