# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

AMERICAN METALS & COAL
INTERNATIONAL, INC.,
a Delaware corporation,

    Plaintiff,

v.            CIVIL ACTION NO.  2:05-cv-00822

WHITE MOUNTAIN MINING CO., LLC,
a West Virginia Limited Liability Company,
et. al,

    Defendants,

WHITE MOUNTAIN MINING CO., LLC,

      Counterclaimant and Third
      Party Plaintiff,

v.

AMERICAN METALS & COAL
INTERNATIONAL, INC., et al

      Counterclaim and Third Party
      Defendants

SCM, INC.,

      Counterclaimant and Third Party
      Plaintiff,

v.

WHITE MOUNTAIN MINING CO., LLC,
et. al,

      Counterclaim and Third Party
      Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the court is White Mountain Mining Co.'s Motion for Partial Summary Judgment [Docket 78] and Motion to Exceed Twenty Page Limitation [Docket 79]. Also pending before the court is American Metals & Coals International, Inc., American Metallurgical Coal Sales, LLC, and SCM, Inc.'s Joint Motion for Summary Judgment [Docket 81] and Joint Motion to Exceed Page Limit [Docket 80]. For reasons appearing to the court, the motions to exceed the page limitations are **GRANTED**. For reasons set forth below, White Mountain Mining Co.'s Motion for Partial Summary Judgment is **GRANTED**, and the Joint Motion for Summary Judgment of American Metals & Coals International, Inc., American Metallurgical Coal Sales, LLC, and SCM, Inc. is **GRANTED** in part and **DENIED** in part. Further, White Mountain's cross motion for summary judgment on liquidated damages, found on pages 5-6 of its Response to the Joint Motion for Summary Judgment [Docket 85], is **DENIED**.

## I. Background

### A. Introduction and Parties

There are three sets of claims at issue in this case. First, SCM, Inc. alleges that Apache Mining, LLC, breached a contract to sell SCM 60,000 tons of coal at $60 per ton. The coal provided under this "Domestic Order" was to be shipped to Wheeling Pittsburgh Steel Corp. Second, American Metals & Coals International, Inc. ("AMCI") alleges that Apache Mining breached a contract, hereinafter referred to as the Export Order, to sell it 60,000 tons of coal at $70 per ton. Third, White Mountain Mining Co. ("White Mountain") alleges that AMCI, American Metallurgical Coal Sales, LLC (AMCS), and SCM engaged in a variety of actions that constitute breach of contract, unjust enrichment, conversion, breach of fiduciary duty, and fraud.

This case is complicated by the number and nature of the parties. The defendant, White Mountain, is a coal-mining company formed originally in 1996 as a Florida limited liability company. (Joint Disclosure Statement 9, White Mountain Mot. Partial Summ. J, Ex. D [Docket 78].) In 2002, White Mountain and several of its subsidiaries, including defendant Apache Mining, entered Chapter 11 bankruptcy. (AMCI Joint Mem. 4-5 [Docket 82].) As part of a 2004 bankruptcy reorganization plan, White Mountain and Apache Mining were dissolved, and in their place a new West Virginia limited liability company was created, also named White Mountain. (White Mountain Mot. Partial Summ. J. 2 n1 [Docket 78].) The rights and duties of the original White Mountain and Apache Mining, including the contracts at issue in this case, were transferred to the "new" White Mountain.[1] (AMCI Joint Mem. 5.)

The plaintiff in this case is AMCI, a Delaware corporation. (AMCI Compl. ¶ 2 [Docket 1].) Also involved in this litigation are the third-party defendants, AMCS and SCM. AMCS is a North Carolina limited liability company. (White Mountain Countercl. & Third Party Compl. ¶ 3 [Docket 6].) AMCS is a subsidiary of AMCI Energy, LLC. (SCM Ans. & Countercl. ¶5 [Docket 12].) SCM is a West Virginia corporation that is a wholly-owned subsidiary of AMCI Resources, Inc., which in turn is a wholly-owned subsidiary of AMCI. (SCM Ans. & Countercl. ¶4.) Prior to February 2003, SCM did business as Metcoal Sales, Inc. (AMCI Joint Mem. Ex. 2; *see also* AMCI Joint Mot. Summ. J. Ex. 1 (organizational chart).) On March 11, 2003, Alpha Natural Resources purchased the assets of SCM and AMCS. (AMCI Joint Mem. 4.)  On December 12, 2005, SCM and other entities

---

[1] For simplicity's sake, the name "White Mountain" will be used to refer both the Florida company and the West Virginia company. Likewise, because Apache Mining is now part of White Mountain, the name "White Mountain" will be substituted for Apache Mining, except where the interests of clarity require greater specificity.

-3-

merged to become Redbank II, Inc. (AMCI Joint Mem. 4; White Mountain Mem. 2 n. 2.) Redbank

II is a wholly-owned subsidiary of AMCI. (SCM Am. Ans. to Third Party Compl. ¶ 4 [Docket 21].)[2]

B. Factual Background

White Mountain is engaged in the mining, processing, and sale of coal. Its operations and

most of its assets are located in Raleigh County, West Virginia. (Joint Disclosure Statement 12,

White Mountain Mot. Partial Summ. J, Ex. D.) On October 15, 2001, White Mountain, Metcoal, and

AMCS entered into a sales agency agreement. As a result of this agreement, AMCS was to act as

coal sales agent for White Mountain. The agreement also provided that AMCS would contract with

purchasers for the sale of White Mountain coal and coordinate shipments of White Mountain coal

to these purchasers. (White Mountain Countercl. & Third Party Compl. ¶ 11-13 [Docket 6]; AMCI

Joint Mem. 6.) Around this same time, Metcoal/SCM helped White Mountain finance the acquisition

of a coal preparation plant and received a first priority deed of trust lien on the plant.  (*See* Joint

Disclosure Statement 45, White Mountain Mot. Partial Summ. J., Ex. D; White Mountain Mem. 4.)

Through AMCS, White Mountain contracted with Wheeling Pittsburgh Steel Corp. ("Wheeling

Pitt") for the sale of coal. Under this contract, White Mountain provided coal to AMCS, who was

to then ship it to Wheeling Pitt. (White Mountain Ans. ¶ 14-15.) During 2001, a dispute arose

between Wheeling Pitt and Metcoal regarding payment for coal provided pursuant to the White

Mountain/AMCS/Wheeling Pitt contract and other spot coal contracts. (AMCI Joint Mem. 7.)

Metcoal sued Wheeling Pitt, and the litigation continued in state court for several years. (AMCI

Joint Mem. 7.)

---

[2] Though Redbank II is the apparent successor of SCM, the parties motions focus on the actions of Metcoal/SCM. Thus, the court will discuss the issues raised on summary judgment in terms of SCM, not Redbank II.

In late 2001, coal production at White Mountain's principal mine was halted due to geological conditions.(Joint Disclosure Statement 13-14, White Mountain Mot. Partial Summ. J., Ex. D.) The financial crisis that followed the mine closure, and a dispute between White Mountain's owners, led to the filing of an involuntary bankruptcy petition against White Mountain on June 26, 2002, in the United States Bankruptcy Court for the Southern District of West Virginia. On August 1, 2002, White Mountain entered Chapter 11 Bankruptcy and became a debtor-in-possession. (Joint Disclosure Statement 21-22, White Mountain Mot. Partial Summ. J., Ex. D.) The bankruptcy was completed in the summer of 2004 and the undisputed bankruptcy claims were paid in late 2005. (White Mountain Mem. 3.)

During White Mountain's bankruptcy, that is, when it was acting as a debtor-in-possession, certain transactions are alleged to have occurred that are relevant to the instant case. White Mountain alleges that on or after March 22, 2003, SCM and Apache entered into a contract whereby Apache would sell coal to SCM and supply it to Wheeling Pitt. At the same time, AMCI would place spot orders with White Mountain for coal at market price. (White Mountain Ans. ¶ 19.)

The other relevant transactions involve litigation between Wheeling Pitt, AMCS, and Metcoal/SCM. By February 2004, this litigation was heading toward settlement. According to AMCI, AMCS, and SCM, the general terms of the settlement were that (1) Wheeling Pitt would drop its counterclaims against AMCI entities, (2) Wheeling Pitt would pay AMCS and Metcoal/SCM approximately $400,000, (3) White Mountain would provide 60,000 tons of coal to SCM for shipment to Wheeling Pitt, (4) White Mountain would supply an additional 60,000 tons of coal to AMCI, and that (5) Metcoal/SCM would release its lien White Mountain's coal preparation plant. (AMCI Joint Mem. 9-10.) The proposed settlement was negotiated by Andrew

Fry,[3] who at this point in time was working for Winding Gulf Coal Sales, LLC ("Winding Gulf"). Winding Gulf was White Mountain's coal sales agent.[4]

The proposed settlement was made official by the execution of several documents. Wheeling Pitt, SCM, and AMCS executed a Settlement Agreement and Mutual Release Form, dated March 1, 2004. The agreement provided that Wheeling Pitt would pay SCM $406,607.40 in three installments. The final installment of $135,535.80 was not due until Wheeling Pitt received 25,000 tons of coal from SCM via Apache Mining/White Mountain.(Settlement Agreement and Mutual Release, AMCI Joint Mot. Ex. 19; AMCI Joint Mem. 10.) Also dated March 1, 2004, was a Sales Acknowledgment entered into by SCM and Wheeling Pitt. The contract provided that SCM would supply Wheeling Pitt with 60,000 tons of coal at $65 per ton. (Sales Acknowledgment: 1-01-2004, AMCI Joint Mot. Ex. 20.) SCM also executed a contract with Apache Mining on March 1, 2004. The agreement (the "Domestic Order"), signed by Andrew Fry of Winding Gulf as agent of Apache Mining/White Mountain, provided that Apache Mining would sell 60,000 tons of coal to SCM at $60 per ton, and ship it to Wheeling Pitt. The contract stated that it was subject to a Terms and Conditions form. (Sales Acknowledgment: 1-01-2004, AMCI Joint Mot. Ex. 21.) The final document dated March 1, 2004, is titled "Sales Acknowledgment: AMCI-02-2004." This document (the "Export Order") purports to be a contract wherein Apache Mining is to provide AMCI with

---

[3] Andrew Fry was involved with several of the transactions relevant to this case. Fry worked for AMCS in 2001 when it was acting as a sales agent for White Mountain. (White Mountain Mem. 6; AMCI Joint Mem. 5.) Fry's employment with AMCS ended in 2003 when its assets were sold to Alpha Natural Resources. (AMCI Joint Mem. 7.) By at least June 19, 2003, Andrew Fry was working on behalf of Winding Gulf. Fry manages Winding Gulf and is a part owner.

[4] Winding Gulf is owned by Andrew Fry, White Mountain, and Joseph Phillips, the manager and indirect owner of White Mountain.

60,000 tons of coal at $70 per ton. Unlike the Domestic Order, the Export Order mentions nothing about being subject to any terms and conditions. It does, however, state that "[t]his purchase is confirmed under the release agreement dated March __, between Metcoal Sales, Riverside and White Mountain." Unlike the other documents dated March 1, 2004, the Export Order is not signed by anyone. (Sales Acknowledgment: AMCI-02-2004, AMCI Joint Mot. Ex. 23.)

On March 23, 2004, a document titled "Sales Acknowledgment Between SCM, Inc., Buyer and Winding Gulf Coal Sales Co., LLC, Agent for Apache Mining Co., LLC, Seller - - Other Terms and Conditions" was executed by SCM and Andrew Fry as agent of Apache Mining. The document stated, among other things, that as consideration for Apache Mining/White Mountain entering into the Domestic Order, SCM would release a lien it held on a coal preparation plant. The document also provided for liquidated damages of $5.44 for each ton of coal Apache Mining/White Mountain failed to deliver under the Domestic Order. The document is silent as to the Export Order. (Other Terms and Conditions ¶ 13, AMCI Joint Mot. Ex. 23.)

Similarly, though the Export Order was allegedly executed after White Mountain entered Chapter 11 bankruptcy, White Mountain's amended reorganization plan makes no mention of the Export Order. It does, however, provide that SCM's $370,933 lien on White Mountain's coal preparation plant is to be satisfied by the Domestic Order. (Joint Disclosure Statement 45, White Mountain Mot. Partial Summ. J., Ex. D.)

C. Procedural History

White Mountain/Apache provided only 17,427 of coal under the Domestic Order and did not ship any coal at all under the Export Order. (White Mountain Mem. 12-13, 16 [Docket 78 Ex. 1].) As a result, AMCI filed a complaint on October 11, 2005, alleging that White Mountain

breached both the Domestic Order and the Export Order. (AMCI Compl. [Docket 1].) Jurisdiction is based on diversity. (AMCI Compl. ¶ 5.) White Mountain answered on December 12, 2005, denying liability. White Mountain also alleged that prior to the bankruptcy, AMCS, AMCI, and SCM breached the 2001 sales agency agreement by diverting White Mountain coal from Wheeling Pitt to other buyers without disclosing the fact, and the resultant profits, to White Mountain. White Mountain also alleged that AMCS/SCM/AMCI breached a 2003 agreement by failing to buy spot orders of coal from White Mountain. In addition, White Mountain alleged that AMCS, SCM, and AMCI engaged in fraud, conversion, breach of duty, and unjust enrichment as a result of allegedly diverting coal under the 2001 sales agency agreement. (White Mountain Countercl. & Third Party Compl. [Docket 6].) AMCI, AMCS, and SCM separately answered the counterclaim/third-party complaint and each party denied liability. (*See* Answers filed at Docket 11, 12, and 16.) Along with its answer, SCM filed a counterclaim against White Mountain for breach of the Domestic Order. (SCM Ans. & Countercl. [Docket 12].) White Mountain denied liability. (White Mountain Ans. to Countercl. [Docket 13].)

All the parties have moved for summary judgment. White Mountain moved for partial summary judgment on the grounds that (1) the Export Order is unenforceable as a matter of federal bankruptcy law, and (2) the Export Order does not constitute a valid contract between White Mountain and AMCI. (*See* White Mountain Mem.; White Mountain Reply [Docket 87].) AMCI, AMCS, and SCM jointly moved for summary judgment. They assert that (1)  White Mountain breached the Domestic Order and is therefore liable for liquidated and consequential damages; (2) White Mountain breached the Export Order; and (3) White Mountain's  claims against them should be dismissed as a matter of law.

## II. Standard for Summary Judgment

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court will not, however, "weigh the evidence and determine the truth of the matter." *Id.* at 249. Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Id.* at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

## III. Discussion

A. White Mountain's Motion for Partial Summary Judgment

White Mountain moves for summary judgment that AMCI's claim that White Mountain breached the Export Order is foreclosed as a matter of law. (White Mountain Mem. 1-2). In its memoranda in support of its motion, White Mountain argues that it is not liable for breach of the Export Order because even if the Export Order constitutes a valid contract between White Mountain and AMCI, federal bankruptcy law prevents its enforcement. Specifically, White Mountain asserts that the Export order was a transaction "other than in the ordinary course of business" involving property of the estate and was entered into without the notice and hearing required by 11 U.S.C. § 363(b). (White Mountain Reply 5.) Moreover, White Mountain maintains that the Export Order was part of a compromise or settlement, and that  to be valid under Rule 9019 of the Federal Rules of Bankruptcy Procedure, notice and a hearing was required. (White Mountain Mem. 13.) Finally, White Mountain contends that the undisputed evidence demonstrates that Andrew Fry, White Mountain's sales agent, had no authority to enter into the Export Order on White Mountain's behalf, and as a result, the Export Order is not enforceable against White Mountain as a matter of law. (White Mountain Mem. 18.)

In response, AMCI, AMCS, and SCM argue that contracting to provide coal is an ordinary part of White Mountain's business. Because of this, 11 U.S.C. § 363(c) provides that no notice or hearing is required for the Export Order to be enforceable. (AMCI Joint Mem. in Opp. 6 [Docket 84].)  AMCI, AMCS, and SCM also argue that Rule 9019 is permissive, not mandatory. (AMCI Joint Mem. in Opp.  8.) Further, they contend that Andrew Fry had actual and apparent authority to bind White Mountain to the Export Order. (AMCI Joint Mem. in Opp. 15.)

-10-

It is not necessary to discuss Rule 9019 or agency law, however, because even if the Export Order constitutes contract between White Mountain and AMCI, it is not enforceable under 11 U.S.C. § 363.

Chapter 11 of the Bankruptcy Code "expressly contemplates that a reorganization will result in the sale or transfer of parts of the debtor's estate." *In re Reg'l Bldg. Sys. Inc.*, 254 F.3d 528, 532-33 (4th Cir. 2001). In order to facilitate reorganization, § 363 of the Code allows a debtor-in-possession to use property of the bankruptcy estate, subject to rules regarding notice to creditors and hearings before the bankruptcy court. *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Section 363(c)(1) provides that a debtor-in-possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1). In contrast, when a debtor-in-possession desires to use property of the bankruptcy estate "other than in the ordinary course of business," it must first give notice to creditors and obtain court approval. 11 U.S.C. § 363(b)(1); *In re Crystal Apparel, Inc.,* 220 B.R. 816, 829 (Bankr. S.D.N.Y. 1998).[5] "The purpose behind the ordinary course of business rule outlined in § 363 is to allow a business to continue its daily operations without incurring the burden of obtaining court approval or notifying creditors for minor transactions, while at the same time protecting secured creditors and others from the dissipation of estate assets." *In re Selgar Realty Corp.*, 85 B.R. 235, 240 (Bankr. E.D.N.Y. 1988). Transactions that violate § 363 are not enforceable. *In re Bridge Info. Sys., Inc.*, 293 B.R. 479, 485-86 (Bankr. E.D. Mo. 2003) ("If the

---

[5] The language of § 363 refers to what a "trustee" can and cannot do, rather than a debtor-in-possession. Section 1107 of the Code, however, gives a debtor-in-possession the powers and duties of a trustee. 11 U.S.C. § 1107.

court does not approve an agreement that disposes of the estate's property in a transaction outside of the debtor's normal course of business, the agreement is unenforceable.").

It is undisputed that the bankruptcy court presiding over White Mountain's bankruptcy did not approve of the Export Order or even conduct a hearing regarding its propriety. It is also clear that the coal that was the subject of the Export Order was property of the bankruptcy estate. Thus, the enforceability of the Export Order, assuming it is a valid contract, depends on whether it was a transaction "in the ordinary course of business" within the meaning of § 363. If it was a transaction in the ordinary course of business, then the lack of a hearing and court approval is not fatal to the Export Order's enforceability. If, on the other hand, the Export Order was a transaction other than in the ordinary course of business, the lack of court approval means that AMCI cannot enforce it against White Mountain.

The phrase "ordinary course of business" is not defined in the Bankruptcy Code. Because of this, courts have applied two tests to determine whether a transaction is in the ordinary course of business. Under the "vertical dimension" test, the court "analyzes the transaction 'from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted' when he initially contracted with the Debtor." *In re Miller Mining, Inc.*, 219 B.R. 219, 222 (Bankr. N.D. Ohio 1998) (citing *In re Dant & Russell, Inc.*, 853 F.2d 700, 705 (9th Cir. 1988)); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986). Applying the vertical dimension test requires comparing the debtor's prepetition business with its postpetition conduct. *Dant & Russell*, 853 F.2d at 705; *In re H & S Transp. Co.*, 115 B.R. 592, 598 (M.D. Tenn. 1990). "[T]he size, nature and type of business, and the size and nature of the transactions in question are relevant to determine whether the transactions are

-12-

ordinary." *In re H & S Transp. Co.*, 115 B.R. at 598 (citing *Johns-Manville*, 60 B.R. at 617). The second test is referred to as the "horizontal dimension" and involves determining "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *Dant & Russell*, 853 F.2d at 704. Under this test a transaction is in the ordinary course of business "when there is a showing that the transaction is the sort occurring in the day-to-day operation of the debtor's business or businesses like it." *In re H & S Transp. Co.*, 115 B.R. at 598.

AMCI argues that under both of these tests, the Export Order, which requires White Mountain to provide it with 60,000 tons of coal at $70 per ton, was in the ordinary course of White Mountain's business. (AMCI Joint Mem. in Opp. 8.) AMCI points out that "White Mountain was and had always been engaged in the mining and selling of coal"and that therefore the Export Order satisfies the vertical dimension test. (AMCI Joint Mem. in Opp. 8.) Likewise, AMCI notes that the horizontal dimension test is met because "all coal mining businesses are engaged in the mining and selling of coal."(AMCI Joint Mem. in Opp. 8.)

AMCI's arguments have some surface appeal. The problem, however, is that AMCI fails to take into account that the Export Order, allegedly executed during the pendency of White Mountain's bankruptcy, is tied to the release of SCM's pre-bankruptcy lien. White Mountain's amended reorganization plan, which the bankruptcy court approved, stated that SCM's lien would be satisfied by White Mountain entering into the Domestic Order. (Joint Disclosure Statement 45, White Mountain Mot. Partial Summ. J., Ex. D.) The plan did not mention the Export Order as part of the lien release. The undisputed evidence, however, demonstrates that the Export Order served as additional consideration for SCM's release of its lien. Hans Mende, one of AMCI's principals, testified at a deposition that:

-13-

We had a lien a lien on there. We secured credit on the East Gulf wash – washing plant. Andy Fry or White Mountain came to us and wanted a release on the security lien, and Andy Fry advanced a solution saying that *if you release the lien on the wash plant, we will enter into two contracts with you*, and one was Wheeling-Pittsburgh. We had contacted Wheeling-Pittsburgh and said he is prepared to supply coal to Wheeling-Pittsburgh from White Mountain through AMCI. And in addition, he agreed to another transaction to sell AMCI 60,000 tons of coal for export. So this was *a package that basically Andy Fry was – advocated on behalf of White Mountain to get a release on the lien* that we had against the wash plant.

(Hans Mende Dep. Tr. 72-73, White Mountain Mot. Partial Summ. J., Ex. H (emphasis added).) Moreover, this package deal was reiterated in an e-mail from Mende to Andrew Fry. (White Mountain Mot. Partial Summ. J., Ex. I). That the Export Order was part and parcel of the lien release is also evidenced by an e-mail from Fry to Mende, Paul Barbery, counsel for AMCI and SCM, and Joseph Ehrengruber, an officer for SCM. This e-mail stated that both the Domestic Order and the Export Order were related to a "release agreement between Riverview, Metcoal and White Mountain/Cimmeron for the liens against the East Gulf/Left Fork plant." (White Mountain Mot. Partial Summ. J., Ex. K.) Likewise, Barbery stated in an e-mail to Fry that the Export Order was related to the lien release. (White Mountain Mot. Partial Summ. J., Ex. O.) It is also noteworthy that in its response to White Mountain's Motion for Partial Summary Judgment, AMCI argues that holding the Export Order unenforceable under bankruptcy law would be inequitable *because* it was related to the lien release. (AMCI Joint Mem. in Opp. 14.)

The significance of the Export Order being tied to the lien release is that whatever the vertical and horizontal dimension tests indicate, § 363 cannot be used to permit transactions "that frustrate the theory and philosophy of the Bankruptcy Code." *In re H & S Transp. Co.*, 115 B.R. at 599. Courts have consistently held that using post-bankruptcy-petition transactions to satisfy prepetition debts is not "in the ordinary course of business," and that such transactions are invalid

absent notice and a hearing. *See In re NextWave Personal Communc'ns, Inc.*, 244 B.R. 253, 275 (Bankr. S.D.N.Y. 2000) ("It is fundamental in a Chapter 11 case that the pre-petition claims of all creditors, whether coming due pre- or post-petition, get paid only by court order or in accordance with a court-confirmed plan of reorganization."); *In re Leslie Fay Co.*, 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) ("[I]f the debtor were to agree to do something extraordinary . . . or to do an act which is inimical to the theory and philosophy of the Code, *such as the payment of prepetition indebtedness*, then . . . pursuant to section 363(b)(1) the agreement is not enforceable absent notice and a hearing.") (emphasis added); *In re J. T. L., Inc.*, 36 B.R. 860, 862 (Bankr. E.D. Mo. 1984) ("[The Bankruptcy] Code does not permit of the payment, post-bankruptcy, out of property of the estate, of pre-petition debts."). In *In re Miller Mining*, 219 B.R. 219 (Bankr. N.D. Ohio 1998), the court found that "postpetition payment on a prepetition debt to a secured creditor" failed the vertical dimension test. The court reasoned that "[i]t is obvious that such a payment would expose a hypothetical creditor 'to economic risks of a nature different from those he accepted' when he initially contracted with the Debtor." *Miller Mining*, 219 B.R. at 223. Moreover, "without notice and a hearing, creditors are not provided with adequate information upon which to object to such a payment being made." *Id.* The court further held that the transaction in that case failed the horizontal dimension test. *Id.*

The Export Order, entered into postpetition, was consideration for the satisfaction of prepetition debt - SCM's lien. Accordingly, it was a transaction "other than in the ordinary course of business," and 11 U.S.C. § 363(b) requires that there be notice and a hearing for it to be enforceable. There was no hearing before the bankruptcy court regarding the Export Order, nor was it mentioned in the reorganization plan. Thus, the Export Order is not enforceable. The lack of notice

and a hearing is especially problematic given that the Fourth Circuit has found that "[i]n order for Chapter 11 creditors to make an informed judgment about whether to vote for the plan, they necessarily must know what property is a part of the plan, whether that property is subject to any liens, and how those liens are being treated." *In re Reg'l Bldg. Sys., Inc.*, 254 F.3d 528, 532 (4th Cir. 2001). As far as the bankruptcy court and White Mountain's other creditors knew, SCM's lien was being released in consideration of White Mountain entering the Domestic Order, not the Domestic Order *and* another contract potentially worth over two million dollars.

AMCI's argument that the court should use its equitable powers to prevent White Mountain "from disavowing the contract entered into by its agent and for which it received financial benefit" is not persuasive. (*See* AMCI Joint Mem. in Opp. 13-14.) First, there is nothing to indicate that by holding the Export Order unenforceable, the court would be condoning fraud. AMCI, AMCS, and SCM are sophisticated parties that have had the benefit of competent and qualified legal counsel. Hans Mende knew that it might be necessary to obtain bankruptcy court approval for the Export Order. In an email, Mende asked Andrew Fry whether bankruptcy approval was needed. (White Mountain Mot. Partial Summ. J., Ex. J.) Moreover, the court does not find it inequitable to hold the Export Order unenforceable when it is clear that the parties could have met the requirements of the Bankruptcy Code - the Domestic Order, for instance, was disclosed to the creditors and the bankruptcy court via the reorganization plan. Finally, the court notes that the equities in this case are less than clear, given the allegations of fraud and the fact that White Mountain argues that it did not have any knowledge of the Export Order.

The court **FINDS** that the Export Order, even if it did constitute a contract between White Mountain and AMCI, was a transaction "other than in the ordinary course of business" that was

entered into without the notice and hearing required by 11 U.S.C. § 363(b). Consequently, the court **FINDS** that the Export Order is not enforceable and **GRANTS** White Mountain's Motion for Partial Summary Judgment. It is therefore not necessary for the court to address the parties' arguments regarding Andrew Fry's actual or apparent authority to contract on behalf of White Mountain. Similarly, it is not necessary to address the parties' arguments regarding Rule 9019 of the Federal Rules of Bankruptcy Procedure.

#### B. AMCI, AMCS, and SCM's Joint Motion for Summary Judgment

AMCI, AMCS, and SCM move for summary judgment that (1) White Mountain breached the Domestic Order and is liable to SCM for $365,419.05 in damages; (2) White Mountain breached the Export Order and is liable to AMCI for $2,400,000 in damages, excluding interest; and (3) White Mountain's counterclaims against AMCI, AMCS, and SCM fail as a matter of law. Because the court has already held that the Export Order is unenforceable, the court cannot grant summary judgment in AMCI's favor on the Export Order. For reasons set forth in greater detail below, the court finds that SCM is not entitled to summary judgment for the amount of consequential damages it claims under the Domestic Order. Nor is White Mountain entitled to summary judgment that it is not liable for consequential damages. The court also finds that there are issues of material fact that make it inappropriate to grant summary judgment in favor of AMCS, and SCM on White Mountain's counterclaims. Finally, the court finds that AMCI is entitled to summary judgment on these counterclaims.

### 1. Breach of the Domestic Order

The parties agree that the Domestic Order - a contract wherein White Mountain/Apache was to provide SCM with 60,000 tons of coal at $60 per ton and ship it to Wheeling Pitt - was a valid

contract between White Mountain/Apache and SCM. ( AMCI Joint Mem. 11; White Mountain Resp. 3.) The parties also agree that White Mountain breached the Domestic Order. (AMCI Joint Mem. 19; White Mountain Resp. 3.) White Mountain concedes that summary judgment is appropriate as to its liability for breach of the Domestic Order. (White Mountain Resp. 3.) The parties further agree that the Domestic Order was subject to a liquidated damages clause that provides for damages of $5.44 for each ton of coal that White Mountain fails to provide. (AMCI Joint Mem. 19; White Mountain Resp. 3.) The parties disagree, however, about the total amount of damages at issue and whether White Mountain's counterclaims can be setoff against SCM's damages. SCM argues that in addition to its liquidated damages, it is entitled to, as a matter of law, consequential damages of $135,535.80 because White Mountain's failure to ship at least 25,000 tons of coal to Wheeling Pitt prevented SCM from receiving payment in that amount from Wheeling Pitt. (AMCI Joint Mem. 19-20.) White Mountain responds by asserting that SCM is limited to its liquidated damages and that White Mountain was not party to an agreement requiring it to pay SCM if Wheeling Pitt does not. (White Mountain Resp. 3-6.) In fact, White Mountain moves for summary judgment on these grounds. (White Mountain Resp. 5-6.) White Mountain also maintains that although it is liable for breach of contract, the court should not grant summary judgment on damages because its counterclaims may affect which party is owed what. (White Mountain Resp. 6.) SCM counters by arguing that the counterclaims cannot setoff against its damages as a matter of law because White Mountain's counterclaims arise out of a transactions unrelated to the Domestic Order. (AMCI Joint Reply 2.)

a. SCM's Motion for Summary Judgment

SCM is not entitled to summary judgment on the consequential damages issue. The Domestic Order involved a sale of coal and is thus governed by the West Virginia Uniform Commercial Code. When a seller breaches a contract for the sale of goods, the buyer is entitled to "the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 2- 715), but less expenses saved in consequence of the seller's breach." W. Va. Code § 46-2-713. Pursuant to § 46-2-715(a)(2)(a), consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." W. Va. Code § 46-2-715(2)(a). In Syllabus Point 4 of *City National Bank of Charleston v. Wells*, 384 S.E.2d 374, 376 (W. Va. 1989), the West Virginia Supreme Court of Appeals held that "[t]o recover consequential damages under W. Va. Code, 46-2-715(2), the buyer must establish: (1) causation, (2) foreseeability, (3) reasonable certainty as to amount, and (4) that he is not barred by mitigation doctrines. The burden of proving consequential damages is on the buyer."

In the present case, SCM has failed to provide any evidence demonstrating that the $135,000 loss it suffered because White Mountain failed to ship at least 25,000 tons of coal to Wheeling Pitt "could not reasonably be prevented by cover or otherwise." Nowhere in SCM's memoranda in support of the joint motion for summary judgment is cover or mitigation discussed. Cover is not mentioned in AMCI's original complaint or in SCM's counterclaim against White Mountain either. [AMCI Compl. [Docket 1]; SCM Ans. & Countercl. [Docket 12].) It may be that SCM had good reason for not providing Wheeling Pitt with substitute coal so that it could receive the third installment payment under the SCM/Wheeling Pitt settlement agreement. The court, however, is not

in any position to speculate. SCM bears the burden of proving that mitigation was not possible. In addition, the issue is before the court on SCM's motion for summary judgment. Because SCM has not provided evidence that cover could not reasonably be obtained, SCM is not entitled to summary judgment as to consequential damages.

In addition, it would be premature at this point for the court to enter a judgment on damages, even though it is undisputed that the liquidated damages provision calls for damages of approximately $230,000. Entry of judgment is not appropriate because White Mountain has brought counterclaims against AMCI, AMCS, and SCM that, if viable, setoff against SCM's damages. SCM argues that the doctrine of setoff does not apply because for setoff to be a defense in an action for breach of contract, "the setoff must arise from the same transaction as is embodied in the contract breached."(AMCI Joint Reply 2.) Here, White Mountain's claims arise out of a breach of contract occurring in 2001 that is unrelated to the Domestic Order, which was executed in 2004.

SCM's statement of the law is incorrect. The West Virginia Supreme Court of Appeals, in Syllabus Point 3 of *Johns-Manville Sales Corp. v. Connelly*, 108 S.E.2d 836, 836 (W. Va. 1959), does not hold that the claim for setoff in that case "should have been dismissed by [the] trial court 'because it arises out of a different transaction.'"(AMCI Joint Reply 2.) Rather, the court held that the claim in that case "was insufficient under the provisions of either Code, 56-5-4 or 56-5-5, in the first instance since the damages are unliquidated and in the second, because it arises out of a different transaction." *Connelly*, 108 S.E.2d at 836. Syllabus Point 3 is actually says that the claim in *Connelly* cannot be used as a setoff because the damages are unliquidated, and it cannot be for recoupment because claims for recoupment must "[a]rise[] out of the contract sued on (never out of a transaction dehors the contract, as in the case of set-off." *Id.* This is consistent with the common

-20-

definition of "setoff" as "[a] defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim." Black's Law Dictionary (8th ed. 2004). Because White Mountain's counterclaims need not be related to the Domestic Order to be setoff against SCM's damages, the court will not grant judgment on damages at this time.

The court **FINDS** that because SCM has not provided any evidence why its damages could not reasonably be prevented by cover or otherwise, SCM is not entitled to summary judgment on consequential damages for breach of the Domestic Order.

### b. White Mountain's Cross Motion

In its response to AMCI's joint motion, White Mountain moves for summary judgment that it is not obligated to pay consequential damages as a matter of law because "(i) White Mountain is not a party to any agreement that calls for White Mountain to satisfy those settlement payments with money, and (ii) because SCM contracted with White Mountain under a written Terms and Conditions Agreement that contains a liquidated damages clause that fixes the extent of SCM's damages." (White Mountain Resp. 5-6.) Neither of these grounds, however, are a sufficient basis for summary judgment. A liquidated damages provision does not necessarily prevent a party from seeking consequential damages. Liquidated damages provisions are permitted so long as the amount is reasonable. W. Va. Code § 46-2-718. Consequential damages may be limited as well. W. Va. Code § 46-2-719(3).There is no provision in the West Virginia Uniform Commercial Code that states that a liquidated damages provision bars the recovery of consequential damages. The authority cited by White Mountain discusses the validity of liquidated damages clauses, not the extent of their reach. Moreover, the West Virginia Supreme Court of Appeals has held that "a provision for liquidated damages will not prevent recovery for actual damages for events which are not covered

-21-

by the liquidated damages clause, unless the contract expressly provides that damages other than those enumerated shall not be recovered." *Vankirk. V. Green Const. Co.*, 466 S.E.2d 787, 719 (W. Va. 1995) (citing *Meyer v. Hansen*, 373, N.W.2d 392, 395 (N.D. 1985)). Here, White Mountain, the moving party on its cross motion, has not demonstrated that the liquidated damages provision was designed to compensate SCM if it was not paid by Wheeling Pitt. Nor does the liquidated damages provision state that it is SCM's exclusive remedy.

Furthermore, it does not matter that White Mountain "is not a party to any document that calls for payment by White Mountain of settlement sums between SCM and Wheeling Pittsburgh Steel."(White Mountain Resp. 4.) Under § 46-2-715(2)(a), consequential damages include "any loss" of which "the seller at the time of contracting had reason to know." W. Va. Code § 46-2-715(2)(a). If White Mountain knew that SCM would not receive its third payment from Wheeling Pitt if White Mountain provided less than 25,000 tons of coal, it is irrelevant for the purposes of consequential damages that White Mountain was not a party to an agreement between SCM and Wheeling Pitt. Accordingly, the court **FINDS** that White Mountain is not entitled to summary judgment regarding consequential damages.

### 2. White Mountain's Counterclaims

White Mountain has brought several claims against AMCI, AMCS, and SCM pursuant to a third party complaint. (*See* White Mountain Counterclaim & Third Party Compl.  [Docket 6].) Specifically, White Mountain alleges (1) breach of a 2001 sales agency agreement between AMCS and White Mountain; (2) breach of a March 22, 2003 coal supply contract between SCM and White Mountain; (3) unjust enrichment by AMCS in relation to the 2001 sales agency agreement; (4) conversion and breach of fiduciary duty by AMCS in relation to the 2001 sales agency agreement;

and (5) fraud by AMCS in relation to the 2001 sales agency agreement. AMCI, AMCS, and SCM move for summary judgment that they are not liable.

First, AMCI moves for summary judgment because "[t]hese claims do not allege involvement, and the undisputed record to date shows no involvement, in any of these alleged agreements or breaches on the part of AMCI." (AMCI Joint Mem. 25.) AMCI is correct. AMCI was not a party to the 2001 sales agency agreement that is the basis for four of White Mountain's claims. Because AMCI is not a party to the agreement, it cannot be liable for breach of that agreement. Moreover, the allegations of unjust enrichment, conversion and breach of fiduciary duty, and fraud are based on the actions of AMCS, not AMCI. Likewise, AMCI was not a party to the 2003 coal supply contract that White Mountain alleges has been breached. In its reply memorandum, White Mountain discusses its "Agent Fraud Claims" exclusively in terms of AMCS and SCM. Accordingly, the court **FINDS** that AMCI is not liable on White Mountain's counterclaims as a matter of law.

Second, SCM moves for summary judgment because "it was not a functioning entity after March 11, 2003," and consequently, cannot be liable on a coal supply contract that was allegedly entered into on March 24, 2003. It is undisputed, however, that SCM entered into the Domestic Order on March 23, 2004. SCM appears to be arguing that it cannot be liable on the 2003 contract because it was not in existence after March 11, 2003, while at the same time arguing for enforcement of a contract it entered into a year later. The court thus **FINDS** that whether SCM had the ability to enter into the alleged 2003 coal supply contract is an unresolved, genuine issue of material fact.

Third, SCM moves for summary judgment based on *res judicata*. "Under *res judicata* principles, a prior judgment between the same parties can preclude subsequent litigation on those

matters actually and necessarily resolved in the first adjudication." *In re Varat Enter., Inc.*, 81 F.3d 1310, 1314-15 (4th Cir. 1996). Claim preclusion exists when "1) the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and, 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding." *Id.* at 1315. It is clear that *res judicata* is applicable in the bankruptcy context; parties "may be precluded from raising claims or issues that they could have or should have raised before confirmation of a bankruptcy plan, but failed to do so." *Id.*

SCM argues that *res judicata* applies because (1) the confirmation of White Mountain's reorganization plan constituted a final judgment on the merits; (2) SCM and White Mountain were parties to the alleged 2003 coal supply contract that is the subject of the White Mountain claim and the bankruptcy case; and (3) the "identity of claims" element is satisfied because White Mountain might have raised its setoff argument during the bankruptcy. (AMCI Joint Mem. 33-34.) Although the first two elements of *res judicata* might be met, the third is not. For *res judicata* to apply in this case, White Mountain's claim against SCM must arise from the "same transaction or series of transactions" as SCM's claim in bankruptcy. White Mountain's claim, however, arises from an alleged 2003 coal supply contract, whereas SCM's claim in bankruptcy involved a lien it held on a coal preparation plant. Unlike the situation in *Varat Enterprises*, the order confirming White Mountain's bankruptcy plan was not based on the transaction at the core of White Mountain's present claim against SCM. Accordingly, the court **FINDS** that *res judicata* does not prevent White Mountain from bringing its claim against SCM.

-24-

Finally, AMCS and SCM argue that White Mountain is estopped from bringing its claims because it failed to disclose them as assets in its bankruptcy. (AMCI Joint Mem. 27; AMCI Joint Reply 5.) The judicial estoppel argument, while potentially meritorious, cannot succeed, however, because there exist genuine issues of disputed material fact that make summary judgment inappropriate.

Courts have long applied the doctrine of judicial estoppel to "prevent[] a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding." *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998). Judicial estoppel has frequently been applied in cases "where litigants intentionally fail[] to disclose claims or potential claims in bankruptcy proceedings." *Casto v. Am. Union Boiler Co.*, No. 2:05-cv-757, 2006 WL 660458, at *2 (S.D. W. Va. Mar. 14, 2006). Application of judicial estoppel is particularly appropriate in cases involving bankruptcy. The Bankruptcy Code requires debtors to disclose all assets, including potential causes of action. *Id.* (citing *In re Baldwin*, 307 B.R. 251, 265 (Bankr. M.D. Ala. 2004). "[T]his duty to disclose continues through the pendency of the bankruptcy proceeding and requires a debtor to amend his financial statements if his or her situation changes." *Id.*

Judicial estoppel applies when: (1) the party to be estopped seeks to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the position is one of fact, rather than one of law or legal theory; and (3) "the party against whom judicial estoppel is to be applied must have 'intentionally misled the court to gain unfair advantage.'" *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (citing *Tenneco Chems., Inc. v. William T. Burnett & Co.*, 691 F.2d 658, 665 (4th Cir.

1982)). The nondisclosure of a claim is intentional "when a litigant has both knowledge of a claim and a motive to conceal a claim." The "bad faith" element is "the determinative factor." *Id.*

AMCS argues that judicial estoppel applies because White Mountain knew that it had a potential claim against AMCS based on the 2001 sales agency agreement, it failed to disclose the potential claim to the creditors or bankruptcy court, and as a result gained over $300,000. (AMCI Joint Reply 5.) AMCS points to several facts as evidence that White Mountain knew it had a claim against AMCS for diverting coal in breach of the sales agency agreement. Joe Phillips, manager of White Mountain, stated in his deposition that sometime between 1999 and 2001, he met with executives from Wheeling Pitt. At this meeting, Wheeling Pitt asked Phillips why White Mountain wasn't supplying Wheeling Pitt with coal as contracted. Phillips replied that he thought White Mountain had supplied the coal. Phillips continued: "I said, go get me your billing receipts, and we showed two trains going out to them, but they didn't get them, and Andy later told me that it was a clerical error, that the girl had billed them to someone else." (Joe Phillips Dep. Tr. 104-106, AMCI Joint Mot. Ex. 15.) David Hill confirmed that Phillips had told him the story of the 2001 meeting. (David Hill Dep. Tr. 39-40, AMCI Joint Mot. Ex. 14.) AMCS also notes a 2003 e-mail written by John Rollins, White Mountain's bankruptcy lawyer and counsel in this case. In this e-mail, Rollins stated that White Mountain "is considering suing AMCI for reporting sales to one customer at particular prices while actually redirecting the coal to others at a large mark up that was not passed on in whole or in part to White Mountain." (AMCI Joint Mot. Ex. 13.) In a similar fashion, SCM contends that if it did breach the alleged 2003 coal supply contract, the breaches would have been apparent to White Mountain during the pendency of the bankruptcy, and therefore should have been disclosed.

-26-

In response, White Mountain argues that the meeting between Phillips and the Wheeling Pitt executives did not put White Mountain on notice that it had a potential cause of action against AMCS because Joe Phillips was told by Andrew Fry that the diversion of coal was caused by a clerical error, as opposed to a scheme by AMCS. Moreover, during deposition Phillips testified that he did not learn that the coal that was supposed to go to Wheeling Pitt was diverted to the spot market until Andrew Fry told him so *after* the present case was initiated. (Joe Phillips Dep. Tr. 205-206, White Mountain Resp. Ex. U.) According to Phillips, it was after the present lawsuit was filed that he "found out that they were taking money from me." (Joe Phillips Dep. Tr. 205-206, White Mountain Resp. Ex. U.)

"Judicial estoppel is invoked with the discretion of the court, and each application must be decided based on the specific facts and circumstances of the case." *Casto*, 2006 WL 660458, at *4. Here, the undisputed facts do not support the doctrine's application, at least on summary judgment. In order for there to be judicial estoppel, White Mountain had to have known that it had a potential cause of action against AMCS or SCM prior to or during its bankruptcy. It is unclear from the testimony of Joe Phillips whether the meeting with Wheeling Pitt put him, and thus White Mountain, on notice that it might have a claim against AMCS. While Phillips was aware that coal was diverted, he was also told that a clerical error was responsible. More troubling is John Rollins's e-mail. It was sent during White Mountain's bankruptcy and referenced possible legal claims against AMCI for diversion of coal. That being said, the Rollins's e-mail is not evidence of bad-faith nondisclosure of a cause of action. "Without bad faith, there can be no judicial estoppel." *Zinkand*, 478 F.3d at 638. A finding of bad faith on this record would be inferential at best, and on a motion for summary judgment, all inferences must be drawn in favor of the non-moving party, i.e., White Mountain. This

is not a case like *Casto*, where the debtor filed a claim with the Human Rights Commission, filed for bankruptcy seven days later, and still failed to disclose the existence of the claim in the bankruptcy proceeding. *Casto*, 2006 WL 660458. Rather, this case contains disputed issues of material fact regarding what White Mountain knew, when White Mountain knew it, and whether an inference of bad faith should be drawn from the facts. Accordingly, the court **FINDS** that there exists genuine issues as to material facts, and that AMCS and SCM are not entitled to summary judged based on judicial estoppel.

## IV. Conclusion

The court **FINDS** that the Export Order is not enforceable and **GRANTS** White Mountain's Motion for Partial Summary Judgment [Docket 78].

The court also **FINDS** that SCM is not entitled to summary judgment on its claim for consequential damages for breach of the Domestic Order. The court further **FINDS** that White Mountain is not entitled to summary judgment with respect to its liability for consequential damages and the Domestic Order. The court therefore **DENIES** White Mountain's cross-motion for summary judgment contained on pages 5-6 of its Response to the Joint Motion for Summary Judgment.

Because AMCI is not related to White Mountain's claims, the court **FINDS** that AMCI is not liable on them. Accordingly, the court **GRANTS** in part AMCI, AMCS, and SCM's Joint Motion for Summary Judgment [Docket 81].

Finally, the court further **FINDS** that *res judicata* is not a bar to White Mountain's counterclaims, that there are genuine issues of material fact regarding SCM's ability to enter into an alleged 2003 coal supply contract, and that there are genuine issues of material fact with respect

to judicial estoppel. Thus, the court **DENIES** in part AMCI, AMCS, and SCM's Joint Motion for Summary Judgment [Docket 81].

    The court **DIRECTS** the Clerk to send a copy of this Written Opinion and Order to counsel of record and any unrepresented party.

                ENTER:        November 16, 2007

                Joseph R. Goodwin, Chief Judge